RENDERED:  MAY 7, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0871-ME

RANDOLPH WAYNE BROWN                                                  APPELLANT


                        APPEAL FROM HARDIN CIRCUIT COURT
v.              HONORABLE PAMELA K. ADDINGTON, JUDGE
                        ACTION NO. 11-D-00351-006


JEANNETTE LYNN GRAY                                                      APPELLEE


OPINION
VACATING AND REMANDING

** ** ** ** **

BEFORE:  ACREE, DIXON, AND MCNEILL, JUDGES.

DIXON, JUDGE:  Randolph Wayne Brown appeals the Hardin Circuit Court's

June 12, 2020, domestic violence order entered upon the petition of Jeanette Lynn

Gray.  We vacate the order and remand.

        The parties have joint custody of their twelve-year-old twins who live

primarily with Gray but with Brown every other weekend and one week per

month.

On May 4, 2020, Gray petitioned for an order of protection based on a single incident. Gray had given one of the children a haircut, and when Brown saw the child on April 22 or 24, 2020, some ten days before Gray filed her petition, he expressed his disapproval by saying he "was going to f---ing kill her" (in obvious reference to Gray). Based on these facts, the circuit court found cause to issue a domestic violence order for three years. This appeal followed.

Brown filed a brief, *pro se*, that falls short of full compliance with our appellate rules. However, Gray filed no brief at all.

When an appellee fails to provide this Court with a brief, it is impossible to conduct the thorough review this Court desires. CR[1] 76.12(8)(c) modifies our review, providing as follows:

> If the appellee's brief has not been filed within the time allowed, the court may: (i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

Pursuant to CR 76.12(8)(c)(iii), this Court could simply elect to regard appellee's failure to file a brief as a confession of error and vacate the order without considering the merits of the case. However, the Court has used a hybrid approach

---

[1] Kentucky Rules of Civil Procedure.

before and shall do so again.  *See Martin v. Cabinet for Health and Family Services*, 583 S.W.3d 12, 17 (Ky. App. 2019).

Pursuant to the rule, this Court shall "accept the appellant's statement of the facts and issues as correct[.]"  CR 76.12(8)(c)(i).  Our examination of the record reveals no substantive contradiction of those facts and issues for the purposes of this appeal.

Consequently, in view of the standard above, Brown's "brief reasonably appears to sustain" reversal of, or in this case the vacating of, the circuit court's order on the basis of violations of procedural due process.  CR 76.12(8)(c)(ii).  For the purpose of appellate review, Gray's decision not to present to this Court any justification for affirming the circuit court on these grounds is an implicit confession of that court's error for these procedural irregularities.  CR 76.12(8)(c)(iii).  We note however, Brown has not, in this appeal, denied the facts forming the basis of the trial court's entry of the DVO.[2]  Therefore, we believe it is

---

[2]  The dissent is correct that Brown denied the allegations against him at the DVO hearing.  That, however, is not the point.  Brown did not deny the allegations *on appeal*.  Consequently, the facts concerning Gray's allegations made against Brown are irrelevant to *this appeal*.  In fact, Brown does not address the facts relating to the trial court's determination at all.  Nevertheless, it appears as if the dissent acts as Brown's advocate, extensively dissecting the evidence—none of which is before us.

Generally,

> a reviewing court will . . . confine itself to errors pointed out in the briefs and will not search the record for errors.  *Ballard v. King*, Ky., 373 S.W.2d 591 (1963).  An appellant's failure to discuss particular errors in his brief is the same as if no brief at all had been filed on those issues.  *R.E. Gaddie, Inc. v. Price*, Ky., 528 S.W.2d 708 (1975).  Consequently, the trial court's determination of those issues

necessary to remand the matter to the trial court for additional proceedings, ensuring Brown's due process rights are protected.

For the foregoing reasons, the Hardin Circuit Court's June 12, 2020, domestic violence order is VACATED, and this case is REMANDED for proceedings consistent with this opinion.

MCNEILL, JUDGE, CONCURS.

ACREE, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

ACREE, JUDGE:  I concur with the majority's decision to vacate the order. However, and respectfully, I do not agree that remanding for further proceedings is

---

not briefed upon appeal is ordinarily affirmed.  *Stansbury v. Smith*, Ky., 424 S.W.2d 571 (1968); *Hall v. Kolb*, Ky., 374 S.W.2d 854 (1964); *Herrick v. Wills*, Ky., 333 S.W.2d 275 (1960); *Craft v. Hall*, Ky., 275 S.W.2d 410 (1955).

*Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979).  Only when facts reveal a fundamental basis for a decision has not been presented by the parties may appellate courts then address the issue in order to avoid a misleading application of the law.  *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991).  That is not the case herein.  The dissent seeks to substitute its view of the *evidence* for that of the trial court.

Moreover, appellate courts should be reluctant to exercise this discretion and do so only when there is no prejudice to either party.  *See Priestly v. Priestly*, 949 S.W.2d 594 (Ky. 1997). Herein, Gray filed no brief disputing alleged procedural errors.  That is a far cry from failing, on appeal, to address factual allegations made during a domestic violence hearing.  Certainly, threats of domestic violence must be taken seriously.  At a minimum, Gray should have the opportunity to assert her arguments in support of the trial court's domestic violence order— arguments having no bearing on procedural irregularities—before an appellate court vacates such order.  Prejudice to Gray is palpable, were this court to do so.

the most appropriate ruling. Further proceedings would be a waste of judicial resources.

To begin, the majority is mistaken in its opinion that "Brown has not denied the facts forming the basis of the trial court's entry of the DVO." At the hearing, he expressly denied making the statement attributed to him by his son. In fact, he denied making any threat at all. He believed Gray had coached the child.

Nevertheless, the son did testify that when Brown saw the haircut Gray had given him,[3] he said, "Jesus Christ, I'm going to f---ing kill her." That is evidence the circuit court was well within its authority to believe. But that belief carries with it other irrefutable facts that mitigate the reasonable reaction to such a statement (both of Gray and the circuit court), beginning with the fact that Brown never made any other similar statements. (Record (R.) at 5.)

Gray did not file her petition for two weeks after Brown allegedly made the statement. She said the delay occurred because the parties' son was "too scared to say anything back to [Brown] or tell [Gray]." (*Id.*) That allegation was contradicted by the son's own testimony. When the circuit court asked him, "Are you ever scared of your daddy?" His answer was, "Not really."

---

[3] The evidence was that Gray's new husband had given him the haircut, but Brown did not know that until the hearing.

Gray filed her petition for a protective order after a dental appointment for the parties' son which Brown attended. (Video Record (V.R.) No. 1 6/8/2020; 10:28:37.) By Gray's own testimony, Brown had attended all such previous appointments, but because of Covid-19 protocol, the dentist would not allow both parents to meet with him. (*Id.* at 10:31:18.) She also acknowledged these visits were always "a point of contention" and that Brown had to file a motion for contempt because of Gray's previous repeated failures to include him. (*Id.* at 10:31:35.) On this occasion, however, compulsory Covid-19 protocol permitted only one person to consult with the dentist. This frustrated Brown. He pointed his finger at Gray without saying a word, told his son he would see him later, and left.

Gray never testified that she was in fear while in the dentist's office. Her representation of this incident as a "little bit of a scene" seems accurate, especially considering she did not call the dentist to testify that it was more. (*Id.* at 10:28:37.) Nor did the son who witnessed the "scene" describe it as fear-inducing. Gray alleged he only said it "embarrassed him." (R. at 5.)

Gray's testimony was that her fear was ginned up during the ride home as she thought about a combination of events. Gray said she thought her son was not acting normally on the ride home. So she asked him "if he had seen dad point at me and give me a mean look" and he said yes. (R. at 5.) According to

Gray, that is when and why he told her what Brown allegedly said two weeks earlier. (R. at 5; V.R. No. 1 6/8/2020; 10:27:44.) She testified it was then that what she earlier characterized as "a little bit of a scene," she now believed was Brown "pointing at me in a threatening manner." (V.R. No. 1 6/8/2020; 10:32:41.) It was then she said she became "extremely scared for myself and for my entire family, and for the children . . . ." (*Id.* at 10:32:51.)

There was other evidence, to be sure. But none of it supported an alleged threat or, assuming Brown made this statement, that such a statement (made weeks earlier and not in Gray's presence) justified a natural and reasonable fear of domestic violence. Brown's evidence, naturally, cast the events in a different light.

A worker for the Cabinet for Health and Family Services testified that the Cabinet had no intention of taking any action. The worker had interviewed the son and his twin sister and, unlike Gray, had no concern for their welfare while with Brown. She also said Brown's son gave no context to Brown's statement; *i.e.*, "whether it was joking or, um, an actual threat." (*Id.* at 10:33:58.)

Then Brown took the stand in his defense. The following is the entirety of his testimony about what he said to his son:

> He came home, to my house, with a jacked-up haircut. *I just commented* to him that he doesn't have to let his mother cut his hair and *that it looked awful*. . . .

> But that's all I said was that he doesn't have to let her cut the hair, that they can go to a barber. . . .
>
> That's all that was said was *I didn't like the haircut.* There was no threats whatsoever. . . .
>
> *I just told him that I didn't like it* and he doesn't need to let his mom cut his hair.

(*Id.* at 10:43:58 to 10:48:05 (emphasis added).) Brown's testimony was unequivocal that his concern was with the haircut only; not once did Brown demean his son or comment on immutable traits. Why is this important? Because that was the circuit court's unfounded focus.

"The court is well familiar with this case," said the circuit court. If Gray's counsel's statement is correct, the family had been before the court off and on over the previous nine years. Apparently, Gray's counsel's starting point for each court appearance was an incident that should have been irrelevant, but that the circuit court admitted it has difficulty getting past. "Aren't you the person who . . . paid for your supervised visits with pennies?" Gray's counsel asked Brown. (*Id.* at 10:49:05.) The circuit court responded, "To be honest, uh, whenever I see Mr. Brown's name, that is the first thing that I think of . . . . It's something that will be indelibly marked in my brain forever, so, we can move on." (*Id.* at 10:49:30.)

Counsel's cross-examination of Brown added nothing further to support the allegations in the petition. When Gray's counsel passed the witness, the circuit court began asking questions.

The circuit court's focus was not Brown's alleged threatening statement; it was his parenting skills and, contrary to all the evidence, the court decided Brown's criticism went beyond the haircut itself to belittling his son.

Court: I want to make sure I understood his testimony correctly. Mr. Brown, I know that you said that you told your son . . . that you were, that you didn't like the fact that his hair was cut either by his mother or stepfather, and that you had told him he didn't have to let his mother or stepfather cut his hair, is that correct?

Brown: Yes, that he didn't have to let them cut his hair at home, that he could just wait till he got a real barber to cut the hair or, and they do this all the time, too, if they buzz the hair [so] it's all one length, it doesn't look bad.

Court: Well let me ask you –

Brown: – um, so –

Court: Okay. And that's what I thought you had said. But I thought I also heard you say that you told [your son] that it looked terrible, or *that he looked terrible*, or something –

Brown: No, it was lopsided –

Court: Well you did say that some time.

Brown: Um.

Court: *You told him he looked terrible or he looked awful.* You told him –

Brown: No.

> Court: *That's what you testified to, sir.*

(*Id.* at 10:50:09 to 10:51:02 (emphasis added).)  The circuit court's statement is a mischaracterization of Brown's testimony.  Nevertheless, Brown respectfully asked to clarify his testimony.

> Brown: Okay, well.  Then let me say it another way.  I just said that it didn't look – The haircut was not flattering.  It didn't look good.  It was – There was crooked parts to it.

> Court: Okay.  I understand that.  But what I'm trying to establish is exactly and precisely what you told your son how he looked.  That's what I'm trying to establish, sir.

> Brown: Okay.  I told him that the haircut did not look good.  Not that he wasn't, you know, a good-looking kid or that, you know, that he was hideously deformed or something.  It's a haircut.  It'll grow back in two weeks –

> Court: Mr. Brown –

> Brown: And that was my whole point.

> Court: Mr. Brown, I think you know the point I'm making and you're doing your best to sidetrack it.  You testified that, I believe that *you said you told him he looked awful*.  Did you say anything like that to your son?  And I realize that you were upset, you didn't like the fact that it may not have been done in a professional manner, even though we're all under a Covid, uh, my grey hair's grown out, too, which I hate it.  Uh, but we all had to endure certain, uh, personal indignities, if you will, because of our governor's executive orders.  *Did you tell your son that he looked awful, or that*

-10-

> *it looked awful, or anything comparable to that, directly to your son*? Did you do that?
>
> Brown: Yes, I did.
>
> Court: Well, thank you. I appreciate your honesty and – it took a little while to get there but I appreciate the fact that you did actually own up to it.

(*Id.* at 10:51:03 to 10:52:27.) Brown "owned up" to nothing more than what he said on direct examination: that "it" – *the haircut* – looked awful. (*Id.* at 10:44:06.)

The circuit court saw no need for closing arguments and ruled from the bench. The court began by saying "I think Mr. Brown has a tendency to, uh, to blurt out things at the moment that he may or may not really mean to be as hurtful sounding as they are." (*Id.* at 10:53:06.) Who among us was never guilty of that crime? Should such statements justify a domestic violence order? If so, the courts will need to order more paper.

Then the circuit court took the mischaracterization of Brown's testimony to the next level, stating:

> Court: I would like to just remind Mr. Brown that regardless how the haircut looked – it may have been lopsided, it may have been in poor taste, it may have been something they shouldn't have done – but it, I think it, probably so your little boy wouldn't have hurt feelings and feeling *he looks like a freak because you've said that to him.*

(*Id.* at 10:54:03 (emphasis added).) Brown said no such thing.

-11-

Then, the circuit court conflated the finger-pointing incident and the court's imagined abasement of Brown's son, and directed these comments to Brown:

> Court: I'm sure you would not appreciate somebody pointing the finger and saying, "Look at Mr. Brown. He's just about bald. He, you know, look at his beard. Why doesn't he put his beard on top of his head." You would not like comments like that if they were addressed to you.

(*Id.* at 10:54:48.) And that indelible image of Brown paying for supervised visitation with pennies remained a factor.

> Court: Sadly, we live in a day and age when somebody says something like, "I'm mad enough to kill somebody," especially when I remember the penny situation – and I'll, I'm always gonna remember that, Mr. Brown. So, every time you come before me in the future, I am, that's the first thing that I think about. And, I'm just going to tell you the honest truth. You were honest with me and I'm gonna be honest with you.

(*Id.* at 10:55:13.)

And, so, I must be honest, too. I believe Mr. Brown was facing an uphill challenge from the moment he walked into court.

I dissent from that part of the majority opinion that remands this case. Brown filed his brief *pro se* and argued a violation of his constitutional rights to procedural due process. I will not take issue with that. My greater concern,

however, is that even the suggestion that this record can justify a protective order lowers the bar too far.

If we ignore the due process protections that may have been deprived and accept as true all the evidence presented that supports Gray's allegations, this record cannot support a finding even "by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur . . . ." KRS 403.740(1). Domestic violence and abuse "means physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple . . . ." KRS 403.720(1). The only possible argument available to Gray is that Brown inflicted upon her a "fear of imminent physical injury[.]"

There is much debate about whether a court's measure of such fear should be objective or subjective. *See* LOUISE EVERETT GRAHAM, JAMES E. KELLER, 15 KY. PRAC. DOMESTIC RELATIONS L. § 5:13, Domestic violence— Defining and proving (2020). The statute, after all, is protective in nature. But the statement attributable to Brown and the incident at the dentist were two innocuous, unrelated, non-contemporaneous events. By the date of the dentist appointment, the son's hair would have grown considerably. That water was long ago under that bridge.

No objectively reasonable fear was justified based on the evidence in this case. Considering Gray's subjective reaction, we have to ask this question: Did Brown intend to instill in Gray a fear or apprehension of imminent harm? Of course not. He said what he said, if he said it, with no expectation Gray would ever hear it. Based on this record, Gray's subjective reaction cannot be called reasonable.

What a low bar we are sanctioning if this evidence is sufficient to create a public record that would negatively affect Brown's employment possibilities, not to mention the nearly casual encroachment upon his substantive constitutional rights. This record justifies dismissal, not a do-over.

For the foregoing reasons, I respectfully dissent, in part.


BRIEF FOR APPELLANT:                    NO BRIEF FILED FOR APPELLEE

Randolph W. Brown, *pro se*
Elizabethtown, Kentucky